[Cite as *Webb v. Anderson Children Trust*, 2020-Ohio-4975.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| KIMBERLY A. WEBB, INDIVIDUALLY AND AS BENEFICIARY OF THE BETTY S. ANDERSON CHILDREN TRUST, | : | APPEAL NO. C-190600 TRIAL NO. 2017-00246 |
| | : | |
| Plaintiff-Appellant, | : | *O P I N I O N.* |
| vs. | : | |
| THE BETTY S. ANDERSON CHILDREN TRUST, | : | |
| and | : | |
| MICHAEL R. WEBB, INDIVIDUALLY AND AS TRUSTEE, | : | |
| Defendants-Appellees. | : | |


Appeal From:  Hamilton County Court of Common Pleas, Probate Division

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: October 21, 2020


*Robbins, Kelly, Patterson & Tucker, LPA, Robert M. Ernst* and *Jarrod M. Mohler*, for Plaintiff-Appellant,

*Haas & Haas Law, LLC*, and *Herbert J. Haas*, for Defendants-Appellees.

**MYERS, Presiding Judge.**

{¶1} Kimberly A. Webb ("Kimberly") appeals from the trial court's judgment in favor of her brother Michael R. Webb ("Michael"), individually and as trustee of the Betty S. Anderson Children Trust, on her complaint asserting various claims relating to their mother's opening a new Individual Retirement Account ("IRA") and her designation of Michael as the sole beneficiary of that IRA.

{¶2} Because the trial court correctly determined that Kimberly failed to prove by clear and convincing evidence that their mother Betty S. Anderson lacked the mental capacity to enter into the IRA agreement and to designate a beneficiary on her IRA, we affirm its judgment.

## I. Background

{¶3} Several months after Anderson's death in May 2012, Michael filed an application in the probate court to relieve Anderson's estate from administration, alleging that she died intestate. He subsequently filed an application to admit a lost will to probate, and the application was granted in August 2013.

{¶4} Under the terms of Anderson's will, her net estate was to be distributed in equal one-third shares to Michael, to the Betty S. Anderson Children Trust, and to the Betty S. Anderson Grandson Trust. Anderson executed the will, created the trusts, and appointed Michael her attorney-in-fact under a durable power of attorney on June 25, 2003. She designated Michael as the successor trustee of both trusts.

{¶5} According to the terms of the Children Trust, the primary beneficiaries of the trust upon Anderson's death were Kimberly and Michael. The trust stated that Anderson's intention was to create a supplemental needs trust for Kimberly, who was

a recipient of government benefits, and that the trust property be used to supplement, not supplant, Kimberly's government benefits.

{¶6} Under the terms of the Grandson Trust, upon Anderson's death, the entire trust estate was to be maintained for the benefit of Kyle M. Webb ("Kyle"), Anderson's grandson. The trust would terminate and the balance of the trust estate would be distributed to Kyle upon his reaching the age of 25.

{¶7} Anderson was the owner of a PaineWebber IRA. Initially, she designated Kimberly and Michael as 50 percent beneficiaries of the IRA. On June 4, 2003, Anderson changed her beneficiary designation on the IRA so that Michael was the sole primary beneficiary. On June 26, 2003 (one day after she executed her will and created the trusts), Anderson again changed the IRA's beneficiary designation. This time she designated Michael, the Children Trust, and the Grandson Trust as primary beneficiaries, each to receive 33 1/3 percent.

{¶8} When Anderson's financial advisor left UBS PaineWebber and joined the Stanford Financial Group, Anderson transferred her IRA to Stanford Financial Group. The beneficiary designation on the account remained unchanged. In early 2009, Anderson learned that Stanford Financial Group was suffering financial difficulties. Michael suggested moving the account to UBS and using his friend Stephen Lee as her financial advisor.

{¶9} Anderson contacted Lee by phone about transferring her IRA. She then met with Lee in person, by herself. Lee believes they may have met in person a second time. Anderson provided Lee the information necessary to make this transition, including filling out a form designating who she wanted as beneficiary. UBS personnel then printed forms for her to sign, which included the information she provided.

{¶10} On February 25, 2009, Anderson executed several documents in relation to opening an account at UBS and transferring her IRA there. At Anderson's

3

request, Michael assisted her with the execution of the forms at her home. Anderson signed a UBS power-of-attorney form designating Michael as power of attorney with respect to the UBS account. Kimberly signed the power-of-attorney form as a witness. Anderson also signed a UBS account-transfer form authorizing the transfer of her IRA from Stanford Financial Group to UBS.

{¶11} In addition, Anderson signed a UBS signature page acknowledging that she had read, understood, and agreed to the terms and conditions of the UBS "Client Relationship Agreement" as well as the terms, conditions, and disclosures included in her "New Account Booklet." The "Client Relationship Agreement" was a single-spaced seven-page document and the "New Account Booklet" incorporated more than 60 pages of account documents pertaining to account information, terms, conditions, and disclosures. The "Client Relationship Agreement" contained a transfer-on-death designation, so that upon Anderson's death, the IRA would be transferred to Michael, the sole beneficiary. Michael delivered the executed documents to Lee.

{¶12} Over a year later, and at Michael's request, the probate court declared Anderson incompetent due to dementia and appointed Michael her guardian in June 2010.

{¶13} On July 20, 2012, two months after Anderson's death, her UBS account, then valued at $433,379.87, was closed and the funds were transferred to Michael.

### *Procedural History*

{¶14} In June 2017, Kimberly filed a complaint for a declaratory judgment, trust accounting, money damages and removal of Michael as trustee of the Children Trust. She alleged that Michael knew Anderson suffered from dementia at the time she opened the UBS IRA in February 2009 and that he allowed himself to be

4

designated as the account's sole beneficiary in contravention of Anderson's will and overall estate plan. Kimberly alleged that Michael converted her share of the UBS IRA, and that he breached his duty as financial power of attorney by designating himself as sole beneficiary. Kimberly also alleged that Michael breached his fiduciary duty when he acted in his own self-interest, failed to disclose his conflict of interest, exerted undue influence on Anderson and/or caused her to execute documents under a mistake of fact. She also alleged that Michael intentionally interfered with her expected inheritance from the account.

{¶15} Kimberly sought a declaration that "the beneficiary designation of Michael as sole beneficiary of the February 25, 2009 UBS IRA account be struck as void, and the beneficiary designations as set forth in the earlier UBS IRA account is [sic] the correct, appropriate, and applicable designations and be applied to the assets contained in [Anderson's] February 25, 2009 UBS IRA." (The earlier UBS IRA that Kimberly referred to designated Michael, the Children Trust, and the Grandson trust as primary beneficiaries, each to receive 33 1/3 percent.) She sought an order that Michael provide an accounting of the IRA, that he be removed as trustee of the Children Trust, and that a constructive trust be imposed over the trust assets.

{¶16} Stephen Lee testified by way of deposition that he met with Anderson alone in his office at least once before February 25, 2009. Anderson told Lee that she needed to transfer her funds out of the Stanford firm as soon as she could in light of its impending bankruptcy. She brought in copies of her Stanford account statements and discussed with Lee her concern that her assets would be safe. Lee testified that Anderson "was a lady that knew what she wanted to do" and that "her objective was to get her assets initially out of the place where she was where she felt that it was in danger and it was a risky situation for her to someplace where she could be comfortable that the assets were being held."

5

{¶17} According to Lee, when he met with Anderson or talked with her on the phone, she was "sharp," and "she had it together when I had conversations with her." Lee testified that when he met with Anderson, she was "a confident lady" who was "strong in her will" and she "had together what she wanted to do." According to Lee, Anderson was "a capable person."

{¶18} Lee testified that before February 25, 2009, neither Anderson nor Michael told him that she had been diagnosed with dementia in January 2009. According to Lee, if he had felt that Anderson was not aware of what she was doing, he would have referred the matter to his firm's legal compliance department.

{¶19} According to Lee, he did not discuss Anderson's beneficiary designations with Michael and those decisions were made by Anderson alone. Lee testified:

> In fact, what would have happened is, is that she and I would have talked, she would have made a decision that she wanted to open an account with UBS, and I would have instructed a secretary, an assistant to prepare, you know, the documents, you know, for her and they would have been sent to her and she would have filled them out, and she would then sent them back.

{¶20} Michael testified that he and Kimberly were present in Anderson's apartment on February 25, 2009, when Anderson executed the UBS documents. He took the executed documents to Lee. He testified that, to his knowledge, Anderson was not suffering from dementia and had not been diagnosed with dementia when she signed the documents. Michael said that he had no discussions with Anderson or Lee about making himself the sole beneficiary of the UBS IRA.

{¶21} Kimberly testified that she remembered being at Anderson's apartment when Michael brought documents for Anderson to sign. She acknowledged that her signature appears on the UBS power-of-attorney form, but

stated that she had not read the document before she signed it. She said that her mother was not in the apartment at the time. According to Kimberly, at the time the documents were signed, her mother "absolutely" knew who Kimberly was. She also knew who Michael and her grandson Kyle were.

{¶22} Kimberly testified that she remembered going to probate court with Anderson in 2010 when Michael applied to have Anderson declared incompetent. She acknowledged that in a prior 2016 deposition she had testified that she thought Michael was going to gain guardianship of Anderson and that, when asked whether Anderson had needed a guardian at that time, she had responded, "No," and when asked, "Because she could take care of her own affairs?," she had responded:

> Basically. She was taking care of her own affairs. Mike would step in periodically. I took her to the doctors. I took her to the bank. I made sure she had her meds. I made sure she ate. I took care of her. * * * She wrote her own checks.

{¶23} Kimberly acknowledged that when asked in the prior deposition whether Anderson was taking care of her own financial affairs in 2010 at the time that Michael sought guardianship, she had responded, "Yes," and had testified that she thought that Anderson did not need a guardian.

{¶24} Barbara Brewer, Ph.D., testified that she first evaluated Anderson on April 2, 2009, because Michael was concerned that Anderson was experiencing a lot of confusion. Dr. Brewer testified that Anderson performed a Mini Mental Status Exam ("MMSE"), and scored 19 out of 30, which meant that she "was on the edge of the mild" range of cognitive impairment.

{¶25} Dr. Brewer testified that she evaluated Anderson again about a year later on March 11, 2010, and that Anderson scored 17 out of 30 on an MMSE, which indicated "severe cognitive impairment." Dr. Brewer used a scoring instrument for the MMSE that interpreted a score of 24-30 as "No cognitive impairment," a score of

18-23 as "Mild cognitive impairment," and a score of 0-17 as "Severe cognitive impairment."

{¶26} In conjunction with Michael's 2010 guardianship application, Dr. Brewer completed a "Statement of Expert Evaluation," which recommended that Michael's application for guardianship be granted. In that statement, Dr. Brewer noted that Anderson was mentally impaired by reason of "Dementia, NOS," and that her prognosis was "poor."

{¶27} Dr. Brewer testified that she prepared an opinion letter for Kimberly's counsel dated March 23, 2018, in which she gave the following opinions:

> The answer to your first question: "On February 25, 2009, was Betty Anderson mentally impaired by reason of Dementia, NOS?" is YES.
>
> * * *
>
> Based on my 2009 (and later, 2010), evaluation of Betty Anderson, it is my opinion that she suffered significant impairments in cognitive comprehension and judgment that make it extremely unlikely that she was able to read or comprehend the Client Relationship Agreement she signed on February 25, 2009.[1]

{¶28} At the conclusion of the trial, the magistrate entered judgment in favor of Michael. The magistrate pointed out that a diagnosis of dementia is not enough to declare Anderson's 2009 beneficiary designation invalid because there must be evidence that the dementia actually affected Anderson's ability to make the designation. The magistrate concluded, therefore, that Dr. Brewer's opinion that Anderson suffered from dementia at the time she made the beneficiary designation was not, in and of itself, determinative of whether the dementia actually affected Anderson's ability to make the designation. The magistrate found no evidence that

---

[1] Dr. Brewer did not comment on Anderson's ability to comprehend the power-of-attorney form or the account-transfer form.

8

Michael manipulated Anderson into making the beneficiary designation. In addition, the magistrate found no evidence that Michael unduly influenced Anderson in making the beneficiary designation or that Michael acted out of self-interest when he assisted her with the transfer of her IRA to UBS.

{¶29} Kimberly objected to the magistrate's decision, specifically challenging the magistrate's conclusion that Kimberly did not present sufficient evidence for the court to declare the 2009 beneficiary designation void.

{¶30} The trial court overruled Kimberly's objections and adopted the magistrate's decision as the judgment of the court. The court determined that Kimberly failed to prove that Anderson lacked the mental capacity to execute the 2009 beneficiary designation. Kimberly now appeals.

{¶31} In a single assignment of error, Kimberly argues that the trial court erred in finding that she failed to present clear and convincing evidence of Anderson's lack of mental capacity to contract. She argues that the court applied the wrong test for mental capacity to contract and that the court's decision was against the manifest weight of the evidence.

### *Mental Capacity*

{¶32} First, Kimberly asserts that the trial court erred by applying the test for testamentary capacity to its determination that Anderson possessed the mental capacity to contract to open the IRA with a transfer-on-death beneficiary designation. She argues that under the Ohio Uniform Transfer-on-Death Security Registration Act, the transfer on Anderson's death was not testamentary so the test for testamentary capacity did not apply to a determination of her capacity to enter into the contract. Rather, she argues that the general test for capacity to enter into a contract governs.

9

**{¶33}** The Ohio Uniform Transfer-on-Death Security Registration Act provides for "designation of a beneficiary to take ownership of the security at the time of the death of the owner." R.C. 1709.04; *Kropf v. Kropf*, 6th Dist. Erie No. E-09-068, 2010-Ohio-4207, ¶ 43. IRA proceeds transfer by virtue of the Act, which provides:

> Any transfer-on-death resulting from a registration in beneficiary form is effective by reason of the contract regarding the registration between the owner of the security and the registering entity by reason of sections 1709.01 to 1709.11 of the Revised Code and is not testamentary.

R.C. 1709.09(A); *LeBlanc v. Wells Fargo*, 134 Ohio St.3d 250, 2012-Ohio-5458, 981 N.E.2d 839, ¶ 31. The Act establishes that upon the death of the owner, ownership of the security shall pass to the designated beneficiary. R.C. 1709.07; *LeBlanc* at ¶ 31. "Accordingly, the Act removes such transfers on death from the decedent's testamentary estate, and also from the purview of Ohio's Statute of Wills, which outlines the formalities that apply to testamentary dispositions." (Emphasis omitted.) *Bielat v. Bielat*, 87 Ohio St.3d 350, 351, 721 N.E.2d 28 (2000).

**{¶34}** The test for mental capacity to enter a contract is whether the person understood the nature of the transaction and the effects of her or his own actions and is similar to the test used to determine testamentary capacity. *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 658, 626 N.E.2d 1017 (8th Dist.1993). Even though the transfer on death of IRA proceeds to a designated beneficiary is contractual and not testamentary, Ohio courts have held that "the test of testamentary capacity can also be used as a standard for mental capacity to execute a beneficiary designation." *Stanek v. Stanek*, 2d Dist. Greene No. 2018-CA-39, 2019-Ohio-2841, ¶ 38, quoting *In re Estate of Flowers*, 2017-Ohio-1310, 88 N.E.3d 599, ¶ 84 (6th Dist.). Similarly, courts have applied the test for testamentary capacity to determine whether a

10

decedent possessed the mental capacity to create a contract for a payable-on-death bank account because such an account provides a vehicle for a person to make dispositions similar to those made under a will. *Giurbino* at 658; *Davis v. Marshall*, 10th Dist. Franklin No. 94APE02-158, 1994 WL 425169, *3 (Aug. 4, 1994); *see Schiavoni v. Roy*, 9th Dist. Medina No. 11CA0108-M, 2012-Ohio-4435, ¶ 17 (annuities). Accordingly, we find no error in the trial court's application of the test for testamentary capacity in the case at bar.

{¶35} The test for testamentary capacity is whether the person "has sufficient mind and memory: First, to understand the nature of the business in which he is engaged; Second, to comprehend generally the nature and extent of his property; Third, to hold in his mind the names and identity of those who have natural claims upon his bounty; [and] Fourth, to be able to appreciate his relation to the members of his family." *Flowers* at ¶ 84, quoting *Niemes v. Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917).

{¶36} To prove a contract or beneficiary designation is voidable on the ground that a party lacked the mental capacity to enter into it, the complaining party must establish the lack of mental capacity by clear and convincing evidence. *Flowers* at ¶ 84; *Giurbino* at 658. Evidence that a person had dementia is insufficient by itself to establish the person's lack of testamentary capacity; there must be evidence that dementia actually affected the person's capacity to make the testamentary disposition. *Flowers* at ¶ 86; *Stewart v. Boland*, 2015-Ohio-1712, 33 N.E.3d 551, ¶ 15 (1st Dist.).

{¶37} Kimberly argues that the court improperly limited its review of Anderson's mental capacity to her designation of a beneficiary and not the seven-page "Client Relationship Agreement" as a whole, which incorporated the 60-plus page "New Account Booklet." Kimberly's complaint, however, sought a declaration striking only the beneficiary designation, not the entire contract, as void. And her

objections to the magistrate's decision were limited to the magistrate's refusal to declare the beneficiary designation void. Although Kimberly now asserts that the trial court's review should have taken into consideration the entire "Client Relationship Agreement," she really only challenges the beneficiary designation.

{¶38} Kimberly points to Dr. Brewer's testimony that it was highly unlikely that Anderson was capable of reading and comprehending the entire agreement, filled with legal clauses and detailed technical information. However, as the trial court pointed out, Dr. Brewer's testimony failed to address the elements of testamentary capacity and whether Anderson's dementia actually affected her ability to make beneficiary designations. And neither the test for testamentary capacity nor the test for capacity to contract generally requires that a person understand each provision of a 60-page agreement.

{¶39} Here, the trial court properly applied the test for testamentary capacity in determining whether Anderson lacked the mental capacity to designate a beneficiary on her IRA. The court determined that (1) Anderson contacted Lee to move her IRA because the institution holding her account was having financial difficulty; (2) Anderson met with Lee independently to open the account; (3) according to Lee, Anderson appeared sharp and confident and knew what she wanted to do; and (4) Anderson's selection of Michael as beneficiary was not inconsistent with at least one of Anderson's prior estate plans and it continued to fulfill Anderson's objective of protecting Kimberly's government benefits. The court concluded that the factors supported a finding of testamentary capacity. Therefore, even though there was evidence that Anderson may not have understood all of the terms of the transfer documents, there was ample evidence that she was capable of knowingly and competently executing the beneficiary designation.

{¶40}  Even applying the test for competency to contract generally, we reach the same result.  It is clear that Anderson understood the nature of the transaction in opening the UBS IRA and the effects of her actions in doing so.

### *Weight of the Evidence*

{¶41}  Kimberly next argues that the trial court's decision was against the weight of the evidence because Dr. Brewer's expert opinion testimony outweighed the lay opinion testimony of Lee.  When reviewing the manifest weight of the evidence in a civil case, "[w]e weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered."  *United States Fire Ins. v. Am. Bonding Co., Inc.*, 1st Dist. Hamilton Nos. C-160307 and C-160317, 2016-Ohio-7968, ¶ 16, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

{¶42}  Here, the trial court's decision makes clear that the court gave careful consideration to the testimony of both Dr. Brewer and Lee.  As the court pointed out, while Dr. Brewer testified that she believed it was highly unlikely that Anderson was capable of comprehending the "Client Relationship Agreement," an MMSE administered by Dr. Brewer five weeks after the agreement was signed indicated that Anderson scored in the range of having only mild cognitive impairment.  The court also noted Dr. Brewer's acknowledgement that a person with dementia may have periods of lucidity.  In addition, the court noted that Dr. Brewer's opinion relied in part on her second evaluation of Anderson, which was conducted more than a year after the signing.

{¶43}  The trial court noted Lee's testimony that, in assisting Anderson with the opening of the UBS IRA, Anderson was sharp, confident, strong in her will, and

knew what she wanted to do. The court noted Lee's testimony that Anderson relayed to him that she needed to move her IRA because the company that currently held the account was having financial difficulty. The court pointed to Lee's testimony that if he had believed Anderson was not aware of what she was doing, he would have referred the matter to their legal compliance department.

{¶44} We cannot say that the trial court clearly lost its way in evaluating the evidence. Therefore, we hold that the court reasonably concluded that Kimberly failed to prove by clear and convincing evidence that Anderson lacked the mental capacity to open the IRA and to make the beneficiary designation. *See Flowers*, 2017-Ohio-1310, 88 N.E.3d 599, at ¶ 96 (where conflicting evidence was presented as to the decedent's testamentary capacity and there was a difference of opinion as to the weight to be given lay and expert witness evidence, the probate court, as the trier of fact, did not lose its way in resolving those conflicts).

{¶45} Consequently, we overrule the assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**BERGERON** and **CROUSE, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.